**SMITH v. RICHART, Colonel United States Army.**

**Civil Action No. 1100.**

District Court, E. D. South Carolina, Columbia Division.

Jan. 27, 1944.

.. 

Grover C. Powell, of Atlanta, Ga., and Curran E. Cooley, of Anderson, S. C., for petitioner.

C. N. Sapp. U. S. Atty., and H. H. Edens, Asst. U. S. Atty., both of Columbia, S. C., and Captain Myron T. Nailling, J.A.G.D., Litigation Officer, Fourth Service Command, of Atlanta, Georgia, for respondent.

WYCHE, District Judge (sitting by designation).

This is an application for writ of habeas corpus filed by Lila Smith, the mother of Louis Dabney Smith, Jr., to obtain his release from the military stockade at Fort Jackson, South Carolina, where he is being held awaiting trial by a general court-martial of the United States Army for violations of Articles of War 64, 65 and 96, 10 U.S.C.A. §§ 1536, 1537, 1568.

I find the facts to be as follows:

The petitioner and her son Louis Dabney Smith, Jr., (hereinafter called the registrant), are members of the sect known as Jehovah's Witnesses. On January 29, 1943, he returned the questionnaire sent him by his Local Draft Board, claiming exemption from combative and non-com-

bative military service on the ground that he was a conscientious objector and a minister "as shown at Acts 20: 20 and Luke 8: 1 in the Bible". His claim for exemption on the ground of being a conscientious objector was later withdrawn. In his questionnaire he stated that he was eighteen years old; that he was a student at the University of South Carolina, majoring in Engineering, preparing for a B.S. degree, and intended to take an examination for a license in Engineering. He also stated that he was not a student preparing for the ministry in a theological or divinity school; that he had been a minister of Jehovah's Witnesses since September, 1938; that he had been formally ordained scripturally as shown by certain verses in Luke, John and Isaiah. He was living with his father, had always received his support, maintenance and education from his father, and no steps had been taken to remove the disability of minority, or to emancipate him from the parental custody and control.

On April 2, 1943, the Local Draft Board placed him in 1–A. The classification was appealed to the Board of Appeal on May 25, 1943, and was affirmed. On June 22, 1943, he appealed from the decision of the Board of Appeal to the President of the United States. His classification was again affirmed. In addition to the regular hearing, the Local Board granted him several special hearings after his classification, and after his first order to report for induction, in which he contended, first, that he was an advertising servant, and later a Pioneer.

The members of the Board had no prejudice against him or his religious sect; they gave full consideration to the matters that were presented by him before and after the President had denied his appeal, and classified him in 1–A, and after due consideration of his additional contentions, concluded that sufficient evidence had not been presented to the Board to justify reopening or re-classifying his case, and on September 18, 1943, he was finally ordered to report, on September 30, 1943, for induction.

On the morning of September 30, 1943, the registrant arrived at Fort Jackson, South Carolina, in company with Magistrate Ollie Mefford, Constable Hough and Constable Thornton; these men were county officers and had called for the registrant at the home of his father Louis Smith in Columbia, South Carolina, in accordance with arrangements previously made with them by his father.

The registrant's father had made arrangements with the county officers to conduct his son to Fort Jackson, South Carolina, because he knew that his son had received an order from his local draft board to report for induction on September 30, 1943, and that he was not going to report. He adopted this plan because of his sense of responsibility in his son's welfare. Neither the local board nor the military authorities knew of or participated in the plan. After the officers arrived at the Smith home, and while they were waiting, the registrant conferred with his father, who advised him to go along with the officers, that they would take him whether he resisted or not. Following this conference, the registrant left the house, entered the automobile with the officers and proceeded to Fort Jackson. No physical force was used, only "moral persuasion".

Upon arrival at Fort Jackson the party stopped at the Provost Marshal's office and were guided from that office to the Induction Station by Sergeant Taylor, who went along with the party to the Induction Station merely to direct them to the location of the Induction Station. He had no advance knowledge that the county officers would bring the registrant to Fort Jackson.

After the party arrived at the Induction Station, the county officers departed and the registrant remained in the office of Sergeant Lanier, Chief Clerk at the Induction Station. He complained to Sergeant Lanier about his classification, stating that he should have been classified 4–D as a minister. Sergeant Lanier called the Clerk of the Local Board in Columbia over the telephone and was told that the registrant had been properly classified, that he was in 1–A, and had been ordered to report on that day for induction. A short time later the registrant joined a group of inductees ordered to report on that day, and went through the process of induction along with them. Before their arrival the registrant told Sergeant Lanier that he would not take the oath. Thereupon Sergeant Lanier read to him the Army Regulations (615–500, Sec. 13e (4)), and advised him that it was not necessary for him to take the oath in order for him to be inducted into the army.

The registrant was not placed under any restraint by the military authorities after his arrival at Fort Jackson and during the induction process he was treated similarly to the other inductees in his group. He had his meals, received his physical and mental examination, and lodged in the barracks with the group. On October 1, 1943, when the group was assembled to receive the oath, he stepped out of line and announced that he refused to take the oath. After the oath was given to the group, he was allowed to return to his home in Columbia, having been transferred to the Enlisted Reserve with orders to report for active duty on October 22, 1943. On October 22, 1943, pursuant to said orders, he voluntarily reported to his local board in Columbia, South Carolina, and was transported to the Reception Center at Fort Jackson.

After the registrant reported back to Fort Jackson on October 22nd, he refused to wear the uniform, or to obey any orders of the officers, or non-commissioned officers, was subsequently arrested, and the foregoing charges preferred against him.

█ The registrant having not yet been tried, the sole issue before me in this controversy is: Has a court-martial of the United States Army jurisdiction of his person, and of the offenses charged against him? Collins v. McDonald, 258 U.S. 416, 42 S.Ct. 326, 66 L.Ed. 692; McCune v. Kilpatrick, Commanding Officer of Hampton Roads Port of Embarkation, et al., D.C. E. D. Va., 53 F.Supp. 80, decided, December 28, 1943.

To decide this issue several questions must be answered,

(1) Was the action of the local draft board arbitrary or unreasonable or invalid for any other reason?

██ I may not try over the issue as to classification passed upon by the board, but if the order of the board is found to lack foundation in law, or to be unsupported by substantial evidence, or to be so arbitrary or unreasonable as to amount to denial of due process, then I must treat it as a nullity. Baxley v. United States, 4 Cir., 134 F. 2d 998. There is nothing in the action of the board in this case upon which such a finding of invalidity can be based. The classification made by the board finds support in the statement of the registrant contained in his questionnaire, and there is nothing in the record of the trial before me upon which I can find that the board's action was arbitrary or unreasonable or invalid for any other reason.

(2) Was the registrant inducted into the United States Army?

The Selective Training and Service Act of 1940, as amended, is implemented by rules and regulations prescribed by the President and appropriate executive agencies, 50 U.S.C.A.Appendix, § 310(a) (1). Under this authority the Selective Service Regulations and Army Regulations pertaining to induction were promulgated.

The Selective Service Regulations provide for the order to report for induction, delivery of men to induction centers, reception of men at induction centers. (Selective Service Regulations, Second Edition, as amended, Section 633.1–633.10.) Section 601.7 reads: "An 'inducted man' is a man who has become a member of the land or naval forces through the operation of the Selective Service System." Neither the Selective Training and Service Act nor the Selective Service Regulations prescribe the induction procedure. Army Regulations (615—500) provide a procedure for induction. Section II, Subsections d and e of Paragraph 13, read: "d. Induction.—Upon completion of the physical examination and after certification by a medical officer, selectees found to be physically and mentally fit for general military service will be inducted.

█ "e. Induction ceremony. (1) The induction will be performed by an officer in a short, dignified ceremony in which the men are administered the oath, Article of War 109 [10 U.S.C.A. § 1581]: (Here follows form of oath). * * * (4) They will then be informed that they are now members of the Army of the United States and given an explanation of their obligations and privileges. In the event of refusal to take the oath (or affirmation) of allegiance by a declarant alien or citizen he will not be required to receive it, but will be informed that his action does not alter in any respect his obligation to the United States. * * *" This regulation has the force of law. United States v. Eliason's Adm'x, 16 Pet. 291, 10 L.Ed. 968; Davis v. Woodring, 72 App.D.C. 83, 111 F.2d 523; Nordmann v. Woodring, D.C., 28 F. Supp. 573; United States v. Drum, 2 Cir., 107 F.2d 897, 129 A.L.R. 1165, certiorari denied, 310 U.S. 648, 60 S.Ct. 1098, 84 L. Ed. 1414.

While Section II, paragraph 13 e(1) of the Army Regulation makes provision for the taking of the oath as a part of the induction ceremony, Subsection e(4) expressly provides that the inductee is not required to receive the oath. The question then arises if the inductee is not required to take the oath, at what point in the induction process does he lose his civilian status and become a member of the armed forces?

As a prerequisite to his being accepted for service the selected man must submit to a mental and physical examination. Section 633.9 of the Selective Service Regulations reads: "At the induction station the selected men found acceptable will be inducted into the land or naval forces." What is the meaning of the words *will be* as used in the foregoing regulation? Counsel for the petitioner take the position that these words mean that something yet remains to be done to accomplish induction after the man is accepted; that the taking of the oath is the formal act which makes the man a member of the armed forces. I do not so construe Section 633.9. The words *will be* as used in the regulations must be coupled with the rest of the phrase, *will be inducted into the land or naval forces*. After the physical and mental examination is completed the inductee will be inducted into either the land forces or the naval forces. The phrase refers to the branch of service into which he will be inducted. The inductee is asked to express his preference of the branch of the service which he desires. This regulation applies to inductees generally.

The Army Regulation (Sec. II, par. 13*d,* 615–500, supra) provides for the induction of men into the army only. "Upon completion of the physical examination and after certification by a medical officer, selectees found to be physically and mentally fit for general military service *will be* inducted." Neither of these regulations states that the man will be inducted after he is accepted. The Selective Service Regulations refer to men "found acceptable". The Army Regulations refer to "selectees found to be physically and mentally fit." These regulations are directives from higher authority. If the selectee meets the requirements he will be inducted. The induction officials do not then have any discretion in the matter. When the selectee is found to be physically and mentally fit for general military service he is accepted and his induc-

tion into the army is complete. From that moment he is in the army. Billings v. Truesdale, 10 Cir., 135 F.2d 505; United States v. Smith, D.C., 47 F.Supp. 607.

■ Petitioner's son was ordered to report for induction. He was given the mental and physical examination by medical officers at the Induction Station at Fort Jackson, South Carolina. He was found to be mentally and physically fit for general military service. He was accepted for general service in the army. Under the Army Regulation above quoted his induction was completed notwithstanding the fact that he refused to take the oath unless, as petitioner contends, the induction proceedings were void because of the manner in which the registrant reported to the induction station.

■ It is unnecessary to decide whether the registrant's father had the right to take him to the Induction Station, or to delegate this authority to the local officers. However, it may be noted that the registrant's father and mother had an equal right in the custody of their eighteen year old son. S.C. Civil Code of 1942, Sec. 8638. And, since the registrant had not been emancipated from his minority, it was the duty of the father to advise, direct and guide his minor son concerning his welfare, his duty to his country, and other matters in the affairs of life, and to use reasonable means to require him to obey the laws of his country. The action taken by the father was for the welfare of his son, it was to keep him from becoming a law violator and to avoid his prosecution for failure to comply with the draft board's order to report for induction. It was not designed to deny him any of his legal rights.

■ Any restraint imposed upon the registrant at the instance of his father by the local officers ended when he was delivered to the Induction Station. The question of the legality of that restraint is not present in this case. Such restraint has terminated and any question concerning it would be moot. This court will not inquire into the legality of a detention which no longer exists. Voloshin v. Ridenour, 5 Cir., 299 F. 134.

All necessary steps, including the order to report, were taken by the local board. It was registrant's duty to report for induction on that day. The board was advised that he was present at the Induction

Station and was still protesting against his classification. The board had no notice of his present claim that he had not legally reported. Had the local board been advised that he was at the Induction Station, claiming that he had been illegally delivered there, the only action it could have taken would have been to advise him that he could leave the Induction Station if he desired and warn him that he would be reported to the United States Attorney as a delinquent. He could have taken this course had he so desired without advice from the board. The object of the order to report was to get him to the Induction Station. He was there when the board received the telephone call from Sergeant Lanier about his classification. Nothing further remained for the board to do in connection with his delivery.

Following the induction proceedings he was given a furlough of three weeks which he spent in Columbia. During this time he did not notify the local board that he claimed his induction was illegal or that he had failed to report and was taken to the Induction Station under restraint, nor did he complain to the military authorities. On the other hand, at the end of that period on October 22, 1943, he voluntarily appeared at the office of the local board in Columbia, joined his group, and returned in an army vehicle to Fort Jackson.

[8] Petitioner contends that if all preliminary steps were completed registrant had no alternative but to take the oath. That when he refused to assent to the oath he should have been reported to the United States Attorney under Selective Service Regulations 642.41. That it was then the duty of the United States Attorney to decide whether he should be prosecuted and that the United States Attorney "would probably have decided here that proper steps had not been completed and would have directed the draft board how to proceed." Selective Service Regulations 642.-42(a) cited as authority for such action by the United States Attorney, is as follows: "642.42. Local board action subsequent to reporting a delinquent to United States Attorney. (a) After a delinquent has been reported to the United States Attorney, it is the responsibility of the United States Attorney to determine whether he shall be prosecuted. Before permitting such a delinquent to be inducted or assigned to work of national importance, the local board should obtain the views of the United States Attorney concerning such action." A careful examination of this regulation does not suggest that it vests the United States Attorney with such authority. The reasonable construction of this regulation is that it merely requires the local board to obtain the views of the United States Attorney before a delinquent registrant is inducted. After the case of a delinquent is placed in the hands of the United States Attorney it would lead to endless confusion if the draft board could go ahead with his induction without consulting the United States Attorney.

From all of the evidence it appears that the registrant was under no physical restraint after he reached the Induction Station. He was in the same category as all the other inductees in his group. Any restraint they were under was moral only. They could have left the Induction Station at any time before they were actually accepted for service. They were not forced to submit to the mental or physical examinations or any of the other features of the induction process any more than they were forced to assent to the oath. Such restraint as the registrant and the other inductees were under during the induction process would not have justified the granting of a writ of habeas corpus. Wales v. Whitney, 114 U.S. 564, 5 S.Ct. 1050, 29 L. Ed. 277.

If the petitioner's position is sound then the registrant should have been reported to the United States Attorney as a delinquent for failure to report for induction. According to this view, had he been rejected for service at the Induction Station, he still should have been reported to the United States Attorney as a delinquent. It follows that he should then be prosecuted for failure to report. Under such circumstances no court could be expected to permit a conviction.

The only possible element that could be lacking to make the registrant's induction legal was his consent to submit to the induction process. I am of the opinion that he consented to go through the induction process. His voluntary return to Fort Jackson is a link in a connected chain of circumstances which leads to the conclusion that he acquiesced in his induction and that he recognized his status as a soldier when he voluntarily returned. The facts in the Billings case, supra, are peculiarly similar. Billings consented to go through

the entire induction process except the assent to the oath. Up to that point he did not object to the induction procedure, but he refused to take the oath. The Court of Appeals for the Tenth Circuit, affirming the District Court, held that his induction had already been completed and that it was not necessary for him to assent to the oath. Billings v. Truesdale, supra.

As stated in United States v. Drum, supra, the courts will not interfere on technical grounds with the tremendous task of mobilizing men for the armed services, where no substantial individual rights are involved. The evidence in this case has demonstrated that the registrant was accorded all his rights under the Act, and Regulations. He has no right not to serve his country.

 It must be concluded, therefore, that the registrant was inducted into the armed forces of the United States, and that a court-martial of the United States Army has jurisdiction of his person and of the offenses charged against him. Selective Training and Service Act of 1940, c. 720, Section 11, 54 Stat. 885, 50 U.S.C.A. Appendix, § 311; Articles of War 64, 65 and 96, 10 U.S.C.A. §§ 1536, 1537, 1568.

For the foregoing reasons, the application for the writ of habeas corpus will be denied, and counsel may submit appropriate order accordingly.

This opinion will stand as the findings of fact, and conclusions of law in this proceeding under Rule 52(a) of Rules of Civil Procedure, 28 U.S.C.A. following section 723c. And, an order so providing must be included in the final order denying the petition.